UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| T.J. MANAGEMENT OF MINNEAPOLIS, INC., d/b/a Gabby's Saloon and Eatery,<br><br>                                      Plaintiff,<br><br>v.<br><br>CITY OF MINNEAPOLIS,<br><br>                                      Defendant. | Civil No. 08-512 (JRT/FLN)<br><br>**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

Scott G. Harris and Christopher M. McGlincey, **LEONARD STREET AND DEINARD**, 150 Fifth Street South, Suite 2300, Minneapolis, MN 55402, for plaintiff.

Franklin Reed, James A. Moore, and Lee Wolf, **OFFICE OF THE MINNEAPOLIS CITY ATTORNEY**, 333 South Seventh Street, Suite 300, Minneapolis, MN 55402-2453, for defendant.

Plaintiff T.J. Management of Minneapolis operates Gabby's Saloon and Eatery ("Gabby's"), which is located in Northeast Minneapolis. Following complaints from nearby residents and a "good cause" determination from a state administrative law judge ("ALJ"), defendant City of Minneapolis placed a number of conditions on plaintiff's liquor license. Plaintiff then filed this action arguing that the imposition of those conditions violates its rights under the Due Process Clause, the First Amendment, and the Equal Protection Clause, and also violates the Minnesota Administrative Procedures Act, *see* Minn. Stat. § 14.69, and the Minnesota Human Rights Act, *see* Minn. Stat. § 363A.14. Plaintiff now moves for a preliminary injunction preventing the imposition

of one of the license conditions.  *See* Fed. R. Civ. P. 65.  For the reasons given below, plaintiff's motion is denied.

## BACKGROUND[1]

Gabby's is located in Northeast Minneapolis, at 1900 Marshall Street Northeast, and sells alcohol on its premises pursuant to a Class B On-Sale Liquor License.  This license was issued by the City of Minneapolis in 1986, and has been renewed each year without special conditions.  Other than one instance in 1999, Gabby's has not been cited for violating any liquor laws or Minneapolis ordinances.

Gabby's typically plays popular dance music, or "Top 40" music, in its upstairs nightclub.  In recent years, its music selections have consisted primarily of hip-hop and rap music.  The parties agree that the majority of Gabby's patrons on its dance nights are African-American.  On Thursdays, Gabby's also holds "Ladies Night," allowing women who pay a $10 cover charge to drink free from 9 p.m. to midnight.  Gabby's hip-hop dance nights are particularly well-attended on Thursdays and Saturdays.  Gabby's closes at 2 a.m. and has an occupancy of 689.

While Gabby's location is zoned for commercial use, it is just blocks away from a residential area.  Beginning in late 2005 or early 2006, defendant contends that it began to receive an exceptional number of complaints from these residents.  Many of these

---

[1] As described below, the parties previously contested these issues in a three-day hearing before a state ALJ.  The background given here is based on the findings of fact provided by the ALJ, as well as on this Court's independent review of the record.  These facts are presented at a very early stage of this case, and are of course subject to further development as the parties proceed with discovery.

complaints related to Thursday and Saturday nights.  The City Department of Regulatory Services later received twelve community impact statements from residents near Gabby's, and their complaints included the following: noise generated by Gabby's patrons, including loud music, yelling and talking; patrons urinating on residential lawns; patrons committing sexual acts in public; burglary, vandalism and loitering; drunken patrons knocking on doors of houses and demanding to be let in; patrons fighting and using drugs; gunfire; obstructed driveways; unacceptable driving conditions; and delayed police response.  The complaints from local residents received the attention of members of the Minneapolis City Council as well as the office of Minneapolis Mayor R.T. Rybak.

Following the complaints, Travis Glampe, a Lieutenant in the Minneapolis Police Licensing Division, began compiling police reports generated from activity at or near Gabby's.  Between November 1, 2005, and November 5, 2006, Glampe discovered 62 reports that he describes as "directly related" to Gabby's.  Each of those incidents occurred after 9:00 p.m., 52 of them occurred after midnight, and 52 of them occurred on either a Thursday or a Saturday night.  The incidents included four reports related to narcotics, four reports of second-degree assault, two weapons violations, two reports of public urination, eight reports of fifth-degree assault, and a shooting.  Glampe also discovered 27 police reports involving a slightly larger area surrounding Gabby's,[2] including 25 that occurred during or after Gabby's Thursday and Saturday dance nights.

---

[2] The specific boundaries used by Glampe for this second analysis were 23rd Avenue Southeast, 17th Avenue Northeast, Marshall Street Northeast, and Grand Street Northeast.

In August 2006, Robert Skomra, the Commander of the Second Precinct that polices the area where Gabby's is located, discussed the complaints with Gabby's owner Jeff Ormond. Skomra allegedly suggested that Gabby's change its format to country music, as a means to changing its clientele.

In November 2006, city officials met with Gabby's owners and presented them with Glampe's compilations of police reports. Defendant then sought Gabby's voluntary agreement to the imposition of several conditions on its liquor license. The conditions that were discussed included the elimination of Thursday and Saturday night drink specials, the imposition of a dress code,[3] an increase in plaintiff's cover charge, and a reduction in plaintiff's maximum occupancy. Plaintiff's owners did not voluntarily agree to these restrictions.

In February 2007, a homicide occurred within 1½ miles of Gabby's. On March 23, 2007, defendant again sought Gabby's agreement to new license conditions. Defendant proposed discontinuing alcohol sales at 11:00 p.m. each night; a midnight closing time; an increase in the cover charge to $15; the elimination of free drink specials; a 6-person increase in the number of off-duty officers serving plaintiff; a $25,000 penalty; and the submission of a new management plan. Plaintiff rejected these conditions.

The City then instituted a formal adverse license action pursuant to the Minnesota Administrative Procedures Act ("MAPA"). Specifically, the City sought a ruling from a

---

[3] Specifically, they discussed a dress code that would bar baggy pants, "white t-shirts as primary outer garment," and baseball caps.

state ALJ as to whether "good cause" existed to either revoke or place restrictions on plaintiff's liquor license. The ALJ held a three-day hearing in October 2007. The City relied on the police reports assembled by Glampe, reports of City License Inspectors' investigations from September 30, 2006 and March 31, 2007, and on the 12 community impact statements. The hearing also included testimony from a number of city officials.

The ALJ concluded that the City lacked the authority to revoke plaintiff's license, but did have "good cause" to take an "adverse license action" pursuant to Minneapolis Code of Ordinances § 259.250(9). The ALJ concluded that good cause existed on two grounds: Plaintiff's "negative impact on its residential neighbors" and its "drain on the City resources." The ALJ recommended that the City impose "appropriate conditions" on plaintiff's liquor license.

The Minneapolis City Council's Public Safety and Regulatory Services Committee ("Committee") then recommended that the City Council impose the following conditions: (1) a reduction in Gabby's maximum occupancy from 689 to 438; (2) the replacement of any free drink specials with reduced drink specials at no less than 50% of regular drink prices (i.e. the "Ladies Night" condition); (3) $25,000 in "sanctions;" (4) a requirement that Gabby's submit an acceptable, comprehensive management plan addressing security, alcohol service, over-service, and other strategies to address criminal activity and neighborhood livability issues; and (5) a requirement that Gabby's maintain a properly trained manager or owner on-site during all business hours. On February 15, 2008, the City Council adopted the Committee's proposed course of action. In the course of approving these conditions, however, defendant granted a stay of the maximum

occupancy condition pending any "appeal." The Mayor approved the action on February 20, 2008, and the conditions went into effect on February 23.

Plaintiff then filed this action on February 25, 2008, alleging that the new license conditions violate its rights under the Due Process Clause, the First Amendment, and the Equal Protection Clause, as well as Minnesota's Administrate Procedures Act and Human Rights Act. Plaintiff moved on the same day for a Temporary Restraining Order ("TRO") preventing the imposition of the "Ladies Night" condition (i.e. the condition restricting drink specials.). At a TRO hearing on February 26, the City agreed to stay the "Ladies Night" restriction until there had been an opportunity for both parties to fully brief the matter.

## ANALYSIS

### I.   JURISDICTION

As an initial matter, the Court notes that neither party has briefed whether this Court should abstain from exercising jurisdiction pursuant to *Younger v. Harris*, 401 U.S. 37 (1971). "*Younger* abstention is appropriate when (1) the federal action would disrupt an ongoing state judicial proceeding (2) which implicates important state interests and (3) which provides an adequate opportunity to raise constitutional challenges." *Cormack v. Settle-Beshears*, 474 F.3d 528, 532 (8th Cir. 2007). The Supreme Court extended this doctrine to ongoing state administrative proceedings in *Middlesex County Ethics Comm'n v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). Moreover, the Eighth Circuit has indicated that *Younger* abstention is not necessarily inappropriate in cases involving claims brought under 42 U.S.C. § 1983. *Cedar Rapids Cellular Tel., L.P. v. Miller*, 280

F.3d 874, 881 (8th Cir. 2002) ("The Supreme Court has applied *Younger* in cases involving state civil proceedings and federal claims under § 1983, and so have we[.]") (citation omitted). Here, both parties agree that plaintiff could have sought review of the license restrictions by pursuing a writ of certiorari in the Minnesota Court of Appeals. *See, e.g.*, *Farrell v. City of Minneapolis*, No. A03-1052, 2004 WL 885692 (Minn. Ct. App. Apr. 27, 2004). While the Court resolves the instant motion on the grounds given below, it will be open to returning to this issue if it is fully briefed by the parties. *See Swisher v. Brady*, 438 U.S. 204, 213 n.11 (declining to address *Younger* abstention *sua sponte*, indicating that it is waivable).

## II.   MOTION FOR PRELIMINARY INJUNCTION

In determining whether a party is entitled to a preliminary injunction, the Court must consider "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citing 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129-30 (2d. ed. 1995)).

### A.      Threat of Irreparable Harm

Plaintiff argues "if Gabby's is deprived of its 'Ladies Night' special, it will suffer immediate and irreparable injury to its goodwill and reputation, will promptly sacrifice twenty-five percent of its overall revenue, and will immediately thereafter suffer such harm on all business nights as to have its entire business destroyed."[4]  If Gabby's were able to demonstrate that the drink special limitation would in fact drive it out of business, this factor would weigh heavily in favor of an injunction.  *See Ryko Mfg. Co. v. Eden Servs.*, 759 F.2d 671, 673 (8th Cir. 1985).  However, the Court is not persuaded that this limitation is likely to have that effect.

As evidence of this imminent harm, plaintiff first cites to a finding of fact by the ALJ.  The ALJ, however, did not address the specific issue before this Court.  The ALJ's finding states "[m]ost likely, the imposition of the suggested conditions would reduce Gabby's revenues so severely it would be forced to close." (Harris Aff., Ex. A, at 8).  However, the context of this finding clearly indicates that the ALJ was referring to the impact of *all* of the conditions suggested by the City, not merely to the impact of the drink special condition.  The ALJ's prior finding listed the entire set of "suggested conditions," which included "an increased cover charge; a reduced occupancy (400); . . . and an earlier closing time (midnight)."  *Id*.  These additional measures were at least

---

[4] At oral argument, plaintiff indicated that it was technically seeking a preliminary injunction as to all of the new license conditions.  Plaintiff added, however, that it would focus its argument on the drink special condition, and conceded that the other conditions would not likely cause irreparable harm.  Plaintiff did not discuss the other conditions in either its briefing or at oral argument.  The Court agrees that the other conditions would be unlikely to cause irreparable harm and focuses its analysis on the drink special condition.

arguably the greatest threat to Gabby's business, leaving the Court without any indication from the ALJ about the specific impact of the restriction on "Ladies Night."

Plaintiff also relies on affidavits from Ormond, Gabby's owner, and Sue Jeffers, a longtime owner of another Minneapolis bar. Ormond's affidavit discusses the general effects of eliminating Gabby's "Ladies Night" drink specials, and suggests that it would ultimately cause Gabby's to "cease to be a viable business." (Ormond Aff., at 4). In a supplemental affidavit, Ormond specifies that these effects would be felt even if "Ladies Night" was merely modified to limit drink specials to "two-for-ones." (Ormond Supplemental Aff., at 1-2). Jeffers's affidavit discusses the manner in which drink specials impact the businesses of bars generally, and asserts that "disrupting customer expectations by discontinuing a long-standing signature promotion, like Gabby's Ladies Night, is a recipe for rapid business loss and closure." (Jeffers Aff., at 5).

"It is . . . well settled that economic loss does not, in and of itself, constitute irreparable harm . . . . Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of [plaintiff's] business." *Packard Elevator v. Interstate Commerce Comm'n*, 782 F.2d 112, 115 (8th Cir. 1986) (citations omitted). The Court does not doubt that both Ormond and Jeffers are correct to the extent that they predict some effect on Gabby's profits. However, the Court is not persuaded that the impact will be as severe as they allege. The "Ladies Night" restriction merely requires a shift from a special permitting free drinks for a three-hour window with a $10 cover charge to a special selling drinks "two-for-one." Moreover, Ormond indicates that "Ladies Night" has merely been a one-night-a-week event. While some customers may

seek steeper discounts elsewhere on those nights, "revenues and customers lost to competition which can be regained through competition are not irreparable." *Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996).

In addition, the Court reads the submitted affidavits alongside evidence of recent proceedings before the City Council. Before imposing the new license restrictions, the City Council considered whether any of them would cause irreparable harm to Gabby's business and thus should be stayed pending appeal. A member of the City Council attempted to identify which specific conditions plaintiff believed would cause such harm, and this exchange followed:

> [City Council Member]
> Ostrow: . . . and even [proposed license restriction] 7, if you can't offer anything less than a half price drink, that's not gonna put Gabby's out of business is it?
>
> [Plaintiff's Counsel]
> Harris: I couldn't comment on that. I have no idea.
>
> Ostrow: Well, I guess I would hope not.
>
> Harris: There's no evidence. The evidence is undisputed.
>
> Ostrow: The one that you're suggesting would put Gabby's out of business is condition 5, that reduces the occupancy?
>
> Harris: And 4.

(Moore Affidavit, at 5). This exchange suggests that the City Council gave plaintiff an opportunity to seek a stay of the "Ladies Night" restriction, and plaintiff declined. Moreover, this exchange took place on February 6, 2008, just 19 days before plaintiff requested a stay from this Court.

Plaintiff attempts to explain this change of course by noting that after the City Council hearing it obtained new evidence of irreparable harm, in the form of the affidavits from Ormond and Jeffers. It would be a stretch, however, to describe these affidavits as new evidence. Ormond's views on the City's proposed conditions have presumably been available to his attorneys ever since this process began, and the "Ladies Night" restriction has clearly been at issue since at least the ALJ hearing in October 2007. Similarly, Jeffers's general views on the value of successful bar promotions do not rely on any new information that would have emerged between the City Council hearing and plaintiff's request for an injunction. In short, it appears that all of the "new" evidence plaintiff relies on now would have been readily available to present to the City Council, which demonstrated its openness to temporary relief by staying the occupancy condition. While this Court has nonetheless fully considered the submitted affidavits, it has done so with plaintiff's candid admission before the City Council closely in mind. Viewing that evidence as a whole, the Court is not persuaded that the drink special restriction threatens Gabby's with irreparable harm.

In sum, if plaintiff ultimately prevails in this action, it will be free to reinstate its drink specials, market those specials to any lost customers, and pursue damages for losses suffered in the interim. The Court finds that this prospect for post-trial relief is sufficient to protect both plaintiff's financial interests and its interest in the goodwill of its

customers.[5]  *Cf. Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

    **B.**    **Remaining *Dataphase* Factors**

Because the Court has failed to find a threat of irreparable harm from the drink special restriction, it addresses the remaining *Dataphase* factors in brief.  *See Reynolds v. Rehabcare Group East Inc.*, 531 F. Supp. 2d 1050, 1065 (S.D. Ia. 2008) ("Absence of irreparable injury is sufficient grounds to deny a preliminary injunction.").  Because the interest of the defendant is theoretically that of the public, the second and fourth *Dataphase* factors may be considered together.  *See Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 372 (8th Cir. 1991).  Neither the balance of the harms nor the public interest, however, clearly favors an injunction.  As outlined above, the effect of the limitation on "Ladies Night" is somewhat unclear.  However, even if it diminishes the number of people who attend Gabby's on Thursdays, it is conceivable that this reduction

---

[5] In plaintiff's initial brief, it also argued that "the City's intended restrictions on free speech independently establishes the requisite degree of irreparable harm." *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Plaintiff did not return to this basis for irreparable harm in its reply brief or at oral argument. In any event, the Court is not sufficiently convinced – at this early stage of the proceedings – that plaintiff's First Amendment claim is likely to succeed on the merits. The conditions imposed on Gabby's are facially neutral as to Gabby's music format. While plaintiff has pointed to suggestions from police that Gabby's change its format, the final decision to impose license restrictions was made by the City Council. Plaintiff has not yet adequately connected the officers' comments to this final decision, which defendant contends was based on livability concerns and crime. *Cf. RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1063 (9th Cir. 2002) ("[A]ppellants have offered undisputed evidence that the withdrawal of the settlement offer depended on appellants' choice of music format.").

in traffic would slightly improve the crime and livability issues alleged by the City.  As to plaintiff's likelihood of success on the merits, the Court notes that – at least at this early stage of the proceedings – none of plaintiff's theories are sufficiently strong to outweigh plaintiff's failure to demonstrate irreparable harm.  Plaintiff has raised interesting issues relating to defendant's reaction to Gabby's predominantly African-American clientele issues that warrant closer examination..  The Court finds, however, that for now, those issues are best left for further development.  Accordingly, plaintiff's motion is denied.

### ORDER

Based on the foregoing, all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that plaintiff's Motion for Temporary Restraining Order or Preliminary Injunction [Docket No. 3] is **DENIED**.


DATED:   April 14, 2008                             s/ John R. Tunheim         _
at Minneapolis, Minnesota.                            JOHN R. TUNHEIM
                                                  United States District Judge